EXHIBIT "A"

EXHIBIT "A"

Electronically Filed
10/2/2023 2:56 PM
Steven D. Grierson
CLERK OF THE COURT

1  **COMP**
   G. MARK ALBRIGHT, ESQ. (NVBN 001394)
2  DANIEL R. ORMSBY, ESQ.  (NVBN 14595)
3  **ALBRIGHT, STODDARD, WARNICK & ALBRIGHT**
   801 South Rancho Drive, Suite D-4
4  Las Vegas, Nevada  89106
   Tel: (702) 384-7111
5  Fax: (702) 384-0605
   gma@albrightstoddard.com
6  dormsby@albrightstoddard.com

7  SETH D RIGRODSKY, ESQ. (*PHV Pending*)
8  TIMOTHY J MACFALL, ESQ. (*PHV Pending*)
   GINA M. SERRA, ESQ. (*PHV Pending*)
9  SAMIR AOUGAB, ESQ. (*PHV Pending*)
   **RIGRODSKY LAW,  PA**
10 825 E. Gate Blvd. Suite 300
   Garden City, NY 11530
11 Tel: (516) 683-3516
12 sdr@rl-legal.com
   tjm@rl-legal.com
13 gms@rl-legal.com
   sa@rl-legal.com
14

15 JOSHUA H. GRABAR ESQ. (*PHV Pending*)
   **GRABAR LAW OFFICE**
16 One Liberty Place
   1650 Market Street, Suite 3600
17 Philadelphia, PA 19103
   Tel: (267) 507-6085
18 jgrabar@grabarlaw.com

19 *Attorneys for Plaintiffs*
20

CASE NO: A-23-878793-B
Department 22

21                  **EIGHTH JUDICIAL DISTRICT COURT**

22                      **CLARK COUNTY, NEVADA**

23 SIMONE BLANCHETTE, Derivatively on          Case No.
   Behalf of Nominal Defendant PAYSIGN, INC.,  Dept No.
24                    Plaintiff,

25 v.                                          **VERIFIED SHAREHOLDER**
                                               **DERIVATIVE COMPLAINT**
26
   MARK NEWCOMER, DANIEL H. SPENCE,
27 DAN R. HENRY, QUINN WILLIAMS, JOAN          **DEMAND FOR JURY TRIAL**
   M. HERMAN, BRUCE A. MINA, DENNIS
28

1  TRIPLETT, and MARK ATTINGER

2                   Defendants,
   and

3  PAYSIGN, INC.,

4
                   Nominal Defendant.
5

6              **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

7        1.      Plaintiff Simone Blanchette ("Plaintiff"), by and through her undersigned attorneys,

8  brings this derivative complaint for the benefit of nominal defendant Paysign, Inc. ("Paysign" or

9  the "Company"), against current and former members of the Company's Board of Directors (the

10 "Board") and certain of its executive officers seeking to remedy the Individual Defendants'

11 (defined below) breach of fiduciary duties and violations of Nevada law.  Plaintiff alleges the

12 following based upon personal knowledge as to herself and her own acts, and information and

13 belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through

14 Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly

15 available documents, including the allegations of the amended consolidated class action complaint

16 filed in a securities class action, captioned *In re Paysign, Inc. Securities Litigation*, Case No. 2:20-

17 cv-00553-GMN-DJ (D. Nev.) (the "Securities Class Action"), conference call transcripts and

18 announcements, filings with the United States Securities and Exchange Commission (the "SEC"),

19 press releases published by and regarding Paysign, legal filings, news reports, securities analysts'

20 reports about the Company, and other publicly available information.

21                        **NATURE OF THE ACTION**

22       2.      This is a shareholder derivative action brought by Plaintiff on behalf of Paysign

23 against certain of its officers and current and former members of the Company's Board for

24 breaches of their fiduciary between at least March 12, 2019, and April 6, 2020, inclusive (the

25 "Relevant Period"), as set forth below.

26       3.      Paysign is a financial technology company that provides card payment solutions

27 and payment processing services.

28 ///

4.      Throughout the Relevant Period, the Individual Defendants knowingly concealed or recklessly disregarded material and persistent deficiencies in the Company's internal controls. For example, during the Relevant Period, the Individual Defendants employed Arthur De Joya ("De Joya") and permitted him to assist in the preparation of the Company's financial statements and public filings even though De Joya had been suspended from practicing as an accountant due to an SEC cease and desist order.

5.      De Joya was well known by the Individual Defendants as he worked for Paysign for several years, serving as the Company's CFO between 2007 and 2015 and as its external auditor. Further, according to the accounts of several former employees, De Joya worked closely with Chief Executive Officer ("CEO") Defendant Mark Newcomer and then-Chief Financial Officer ("CFO") Defendant Mark Attinger, and his office was directly adjacent to their office. Further, it was widely known throughout the Company that De Joya was legally prohibited from working in certain capacities at Paysign.

6.      The SEC suspended De Joya in 2015 after he ignored glaring signs of an elaborate fraudulent scheme during the audit of another company. The SEC's 2015 cease-and-desist order against De Joya was published on the SEC's website. De Joya was further subject to disciplinary action by the Nevada State Board of Accountancy ("NSBA") which imposed a thirty month probation, preventing De Joya from applying to practice before the SEC again until the end of 2018.

7.      In addition to the employment of De Joya, Paysign' s inability to track its revenues and cashflows was a severe weakness in the Company's internal controls over financial reporting. According to a former Paysign employee, the Company's revenue and cashflow figures were materially inaccurate, and CFO Defendant Mark Attinger worked personally to correct the mistakes in the Company's general ledger accounts in late 2019.

8.      The Individual Defendants further knew of or recklessly disregarded internal weaknesses in the Company's information technology ("IT") general controls. A former employee of the Company explained that, during the Relevant Period, Chief Technology Officer ("CTO") Defendant Daniel H. Spence frequently made programming changes to the Company's software

that materially altered the account balances for customers' prepaid debit cards. According to this former employee, customers regularly called to complain about the issue, but Paysign's Customer Service Representatives had no ability to remedy the situation. Further, CEO Defendant Mark Newcomer was aware of the problem during the Relevant Period.

9.     Throughout the Relevant Period, the Individual Defendants issued false and misleading statements, concealing from shareholders and the public the material deficiencies in the Company's internal controls.

10.    Further, while the price of Paysign stock was artificially inflated as a result of the Individual Defendants' materially false and misleading statements, certain of the Individual Defendants offloaded their personal shares of Company stock.

11.    The truth began to emerge on March 16, 2020, when the Company announced that it would be unable to timely file its Annual Report due to material deficiencies in its internal controls.

12.    On March 31, 2020, the Company issued a press release announcing that the Company would be delaying its earnings call as well "to complete its year-end closing procedures."

13.    On this news, the price of Paysign's common stock fell from $5.16 per share on March 31, 2020, to $4.35 per share on April 1, 2020, a 22% decline in just one day. The price of Paysign's stock continued to decline the following day, closing at $4.03 per share on April 2, 2020.

14.    In April 2020, the Individual Defendants finally disclosed the material deficiencies in the Company's internal controls, including "lack[ing] sufficient monitoring and disclosure controls to prevent and terminate the employment of an individual barred from practicing before the Securities and Exchange Commission who assisted the Company in accounting matters related to the preparation of its financial statements for 2017, 2018, and 2019." The Individual Defendants further admitted that material weaknesses existed in the Company's IT general controls related to software updates.

15.    As a result of the foregoing, The Securities Class Action was filed against the Company, CEO Defendant Mark Newcomer, Defendant Mark Attinger, who served as Paysign's

CFO during the Relevant Period, and CTO Defendant Daniel H. Spence, exposing the Company to massive class-wide liability.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over each defendant named herein. Paysign is a Nevada corporation organized and existing under Nevada law, and it maintains its principal executive offices in Nevada, and the Individual Defendants are current or former officers and directors of Paysign.

17.     Venue is proper because the acts by the Individual Defendants complained of herein occurred in Nevada. The Individual Defendants are members or former members of Paysign's Board or senior officers of the Company that have harmed Paysign. The Individual Defendants accordingly have sufficient minimum contacts with Nevada so as to render the exercise of jurisdiction by this Court permissible under the traditional notions of fair play and substantial justice.

## PARTIES

*Plaintiff*

18.     Plaintiff is, and since February 2017 has been, a continuous shareholder of Paysign.

*Nominal Defendant*

19.     Nominal Defendant Paysign is a financial technology company incorporated in Nevada. The Company maintains its principal executive offices at 1700 W Horizon Ridge Parkway, Suite 200, Henderson, Nevada 89012. Shares of Paysign common stock trade on the NASDAQ under the symbol "PAYS."

*The Individual Defendants*

20.     Defendant Mark Newcomer ("Newcomer") is one of Paysign's cofounders, and he has served as CEO of the Company and Chairman of the Board since March 2006. Defendant Newcomer additionally served as President of the Company between March 2006 and February 2021. According to the Company's public filings, Defendant Newcomer beneficially owned 9,034,146 shares of the Company's common stock as of April 15, 2020, worth more than $59 million and constituting 18.4% of Paysign's outstanding stock at that time, and he received

$1,031,969 in 2019 in compensation from the Company. During the Relevant Period, and while in possession of material non-public information, Defendant Newcomer offloaded 235,000 personal shares of Company stock at artificially inflated prices for proceeds of more than $2.5 million dollars.

21.    Defendant Daniel H. Spence ("Spence") is one of Paysign's cofounders, and he served as CTO of the Company and as a member of the Board between March 2006 and August 2022. According to the Company's public filings, Defendant Spence beneficially owned 8,790,000 shares of the Company's common stock as of April 15, 2020, worth more than $57.4 million and constituting 17.9% of Paysign's outstanding stock at that time, and he received $663,036 in 2019 in compensation from the Company. During the Relevant Period, and while in possession of material non-public information, Defendant Spence offloaded 120,000 personal shares of Company stock at artificially inflated prices for proceeds of more than $1.33 million dollars.

22.    Defendant Dan R. Henry ("Henry") has served as a member of the Board of the Company since May 2018 and serves as Chair of the Compensation Committee and as a member of the Audit Committee. According to the Company's public filings, Defendant Henry beneficially owned 600,000 shares of the Company's common stock as of April 15, 2020, worth more than $3.92 million and constituting 1.2% of Paysign's outstanding stock at that time, and he received $413,568 in 2019 in compensation from the Company. During the Relevant Period, and while in possession of material non-public information, Defendant Henry offloaded 150,000 personal shares of Company stock at artificially inflated prices for proceeds of more than $1.7 million dollars.

23.    Defendant Quinn Williams ("Williams") served as a member of the Board of the Company between April 2018 and December 2022 and served as a member of the Audit Committee during the Relevant Period. According to the Company's public filings, Defendant Williams beneficially owned 85,000 shares of the Company's common stock as of April 15, 2020, worth $555,900 and constituting .2% of Paysign's outstanding stock at that time, and he received $100,891 in 2019 in compensation from the Company. During the Relevant Period, and while in

///

possession of material non-public information, Defendant Williams offloaded 15,000 personal shares of Company stock at artificially inflated prices for proceeds of more than $164,000 dollars.

24.     Defendants Newcomer, Spence, Henry, and Williams are herein referred to as the Insider Trading Defendants.

25.     Defendant Joan M. Herman ("Herman") has served as a member of the Board of the Company since November 2018 and as Executive Vice President, Operations since February 2021. Defendant Herman additionally served as Chief Operations Officer ("COO") of the Company between September 2017 and February 2021. According to the Company's public filings, Defendant Herman beneficially owned 519,808 shares of the Company's common stock as of April 15, 2020, worth more than $3.39 million and constituting 1.1% of Paysign's outstanding stock at that time, and she received $407,700 in 2019 in compensation from the Company.

26.     Defendant Bruce A. Mina ("Mina") has served as a member of the Board of the Company since March 2018 and serves as Chair of the Audit Committee and as a member of the Compensation Committee. According to the Company's public filings, Defendant Mina beneficially owned 105,500 shares of the Company's common stock as of April 15, 2020, worth $689,970 and constituting .2% of Paysign's outstanding stock at that time, and he received $79,456 in 2019 in compensation from the Company.

27.     Defendant Dennis Triplett ("Triplett") has served as a member of the Board of the Company since May 2018 and serves as a member of the Audit Committee and the Nominating Committee. According to the Company's public filings, Defendant Triplett beneficially owned 100,000 shares of the Company's common stock as of April 15, 2020, worth $654,000 and constituting .2% of Paysign's outstanding stock at that time, and he received $87,817 in 2019 in compensation from the Company.

*Officer Defendant*

28.     Defendant Mark Attinger ("Attinger") served as Paysign's CFO and Treasurer between December 2018 and February 22, 2021. According to the Company's public filings, Defendant Attinger beneficially owned 52,843 shares of the Company's common stock as of

///

April 15, 2020, worth $345,593 and constituting .1% of Paysign's outstanding stock at that time, and he received $647,088 in 2019 in compensation from the Company.

***Non-Party Confidential Witnesses***

29.     This action is based on Plaintiff's review, by counsel, of an extensive record of public documents, as well as the Amended Class Action Complaint (the "Amended Complaint") in the Securities Action, which contains detailed allegations based on interviews with former Paysign employees (referred to herein as "Fes" 1-6) who provided information to the plaintiffs' counsel in the Securities Action on a confidential basis and were described in the Amended Complaint with sufficient detail to establish their reliability and personal knowledge.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

30.     By reason of their positions as officers and/or directors of Paysign, and because of their ability to control the business and corporate affairs of Paysign, the Individual Defendants owed Paysign and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Paysign in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Paysign and its shareholders so as to benefit all shareholders equally.

31.     Each director and officer of the Company owes to Paysign and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

32.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Paysign, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

33.     To discharge their duties, the officers and directors of Paysign were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

34.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good

faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Paysign, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

35.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, ownership, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

36.     To discharge their duties, the officers and directors of Paysign were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Paysign were required to, among other things:

  a)   ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Nevada and the United States, and pursuant to Paysign's own Code of Business Conduct & Ethics (the "Code of Conduct");

///

///

b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock

c) remain informed as to how Paysign conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Paysign and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Paysign's operations would comply with all applicable laws and Paysign's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

37. Each of the Individual Defendants further owed to Paysign and the shareholders the duty of loyalty requiring that each favor Paysign's interest and that of its shareholders over their

///

1 own while conducting the affairs of the Company and refrain from using their position, influence,

2 or knowledge of the affairs of the Company to gain personal advantage.

3       38.      At all times relevant hereto, the Individual Defendants were the agents of each other

4 and of Paysign and were at all times acting within the course and scope of such agency.

5       39.      Because of their advisory, executive, managerial, and directorial positions with

6 Paysign, each of the Individual Defendants had access to adverse, non-public information about

7 the Company.

8       40.      The Individual Defendants, because of their positions of control and authority, were

9 able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein,

10 as well as the contents of the various public statements issued by Paysign.

11                        **PAYSIGN'S CODE OF ETHICS**

12       41.      Paysign maintains a Code of Ethics that expressly applies to all Company

13 employees including "all staff with whom a service contract exists, management, non-

14 management, directors, contractors, consultants and temporary staff." The Code of Ethics provides

15 that "[c]ompliance with the code by all employees is mandatory."

16       42.      In a section titled "**COMPLIANCE WITH LAWS AND REGULATIONS**"

17 (emphasis in original), the Code of Ethics states, in pertinent part:

18       Employees must comply with all applicable laws and regulations which
         relate to their activities for and on behalf of Paysign. Paysign will not tolerate any
19       violation of the law or unethical business dealing by any employee, including any
         payment for, or other participation in, an illegal act, such as bribery.
20

21       Paysign is committed to full compliance with the laws and regulations of
         the cities, states and countries in which it operates. You must comply with all
22       applicable laws, rules and regulations in performing your duties for Paysign.
         Numerous federal, state and local laws and regulations define and establish
23       obligations with which Paysign, its employees and agents must comply. Under
         certain circumstances, local country law may establish requirements that differ
24       from this code.

25

26       43.      In a subsection titled "**Insider Information and Insider Trading**" (emphasis in

27 original), the Code of Ethics states:

28 ///

- 11 -

Employees may receive information concerning Paysign or one of its affiliates, business partners, clients, or customers that is confidential and not generally known by the public. If that information is "material" (i.e., publication of that information is likely to affect the market price of the stock of the entity to which the information relates), then the employee has an ethical and legal obligation not to (a) act on that information (i.e., buy or sell stock based on that information), (b) disclose that information to others, or (c) advise others to buy or sell the stock of the entity to which that information relates, until such information becomes public. An employee's direct or indirect use of or sharing of such confidential, privileged, or otherwise proprietary business information of Paysign or its partners, clients, or customers for financial gain, including investment by the employee or the transmission of this information to others so that they can use this information for their financial gain, constitutes insider trading, which is a criminal offense. Please refer to Paysign's Insider Trading Policy for more information.

44.     In a section titled "**PAYSIGN'S FUNDS AND PROPERTY**" (emphasis in original), the Code of Ethics states:

Paysign has developed a number of internal controls to safeguard its assets and imposes strict standards to prevent fraud and dishonesty. It is every employee's responsibility to implement, maintain and enhance the effectiveness of the control environment in which they operate. All employees who have access to Paysign's funds in any form must at all times follow prescribed procedures for recording, handling and protecting such funds. Operating areas may implement policies and procedures relating to the safeguarding of Paysign property, including computer software. Employees must at all times ensure that Paysign's funds and property are used only for legitimate Paysign business purposes. Where an employee requires Paysign funds to be spent, it is the employee's responsibility to use good judgment on Paysign's behalf and to ensure that appropriate value and authorization is received for such expenditure. All payments made by or on behalf of Paysign for any purpose must be fully and accurately described in the documents and records supporting the payment. No false, improper, or misleading entries shall be made in the books and records of Paysign. Complete and accurate information is to be given in response to inquiries from Paysign's Audit Committee and certified public accountants. If employees become aware of any evidence that Paysign funds or property may have been or are likely to be used in a fraudulent or improper manner they should immediately and confidentially advise Paysign as set out in the contravention of the code section of this document. It is Paysign's policy that no retaliation or other adverse action will be taken against any employee for good- faith reports.

45.     In a section titled "**PAYSIGN'S RECORDS**" (emphasis in original), the Code of ethics states:

Accurate and reliable records of many kinds are necessary to meet Paysign's legal and financial obligations and to manage the affairs of Paysign.

Paysign's books and records should reflect all business transactions in an accurate and timely manner. Undisclosed or unrecorded revenues, expenses, assets or liabilities are not permissible, and the employees responsible for accounting and record-keeping functions are expected to be diligent in enforcing proper practices.

46.     In a subsection titled "**Prompt Communications**" (emphasis in original), the Code of Ethics states:

Paysign strives to achieve complete, accurate, fair, understandable and timely communications with all parties with whom it conducts business, as well as government authorities and the public. All employees must take all steps necessary to assist Paysign in fulfilling its disclosure responsibilities. In addition, prompt and effective internal communication is encouraged.
A prompt, courteous and accurate response should be made to all reasonable requests for information and other client communications. Any complaints should be dealt with in accordance with internal procedures established by various operating areas of Paysign and applicable laws.

47.     In a section titled "**OBLIGATIONS OF EMPLOYEES**" (emphasis in original), the Code of Ethics states:

It is of paramount importance to Paysign that all disclosure in reports and documents that Paysign files with, or submits to, the SEC, and in other public communications made by Paysign is full, fair, accurate, timely and understandable. You must take all steps available to assist Paysign in fulfilling these responsibilities consistent with your role within the Paysign. In particular, you are required to provide prompt and accurate answers to all inquiries made to you in connection with the Paysign's preparation of its public reports and disclosure. All employees must perform their duties diligently, effectively and efficiently, and in particular:

a) support and assist Paysign to fulfill its commercial and ethical obligations and objectives as set out in this Code;

b) avoid any waste of resources, including time;
c) be committed to improve productivity, achieve the maximum quality standards, reduce ineffectiveness, and avoid unreasonable disruption of activities at work;

d) commit to honoring their agreed terms and conditions of employment;

e) not act in any way that may jeopardize the shareholders rights to a reasonable return on investment;

- 13 -

f) act honestly and in good faith at all times and report any harmful activity they observe in the workplace; g) recognize fellow employees' rights to freedom of association and not intimidate fellow employees;

h) pay due regard to environmental, public health and safety conditions in and around the workplace; and

i) act within their powers and not carry on the business of Paysign recklessly.

### PAYSIGN'S AUDIT COMMITTEE CHARTER

48. Pursuant to Paysign's Audit Committee Charter, the primary function of the Audit Committee is to:

[O]versee the Company's accounting and financial reporting processes and the audit of the Company's financial statements. The Committee shall assist the Board with oversight of:

a) The quality and integrity of the Company's financial statements;

b) The Company's compliance with legal and regulatory requirements;

c) The independent auditor's qualifications and independence; and

d) The performance of the Company's internal audit function and independent auditors.

49. The Audit Committee Charter further provides that the Audit Committee will "provide[ ] oversight regarding significant financial matters, including such matters as borrowings, currency exposures, dividends, share issuance and repurchases, and the financial aspects of the Company's benefit plans."

50. In a section titled "**DUTIES AND RESPONSIBILITIES**" (emphasis in original), the Audit Committee Charter states, in pertinent part, that the Audit Committee shall:

1. Have the sole authority to appoint, retain, compensate, oversee, evaluate and, where appropriate, terminate the independent auditors who shall audit the financial statements of the Company.

2. Select, retain, compensate, oversee and terminate, if necessary, any other registered public accounting firm engaged by the Company for the purpose of preparing or issue an audit report or performing other audit, review or attest services for the Company.

3.    Inform each registered public accounting firm performing audit or permissible non- audit services for the Company that such firm shall report directly to the Committee.

* * *

6.    Review, at least annually, the qualifications, performance and independence of the independent auditor. In conducting such review, the Committee shall obtain and review a report by the independent auditor describing: (1) the audit firm's internal quality-control procedures; (2) any material issues raised by the most recent internal quality-control review, or peer or PCAOB review of the firm, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, regarding one or more independent audits carried out by the firm, and any steps taken to deal with any such issues; and (3) to assess the auditor's independence, all relationships between the independent auditor and the Company. The independent auditors shall provide the Committee with a written statement describing all relationships between the auditors and the Company, and the Committee shall discuss with the independent auditors any disclosed relationships or services that may impact the objectivity or the independence of the auditors.

* * *

9.    Review, periodically, issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies; analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements; and the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company.

10.   Review and discuss, at least annually, with the Company's independent auditors the matters required to be discussed by PCAOB Auditing Standards No. 16 -- Communications with Audit Committees and the Statement on Auditing Standards No. 61 (Codification of Statements on Auditing Standards, AU Sec. 380), as modified or supplemented.

11.   Review with management, the independent auditors, and the internal auditors, [*sic*] if any, the adequacy and effectiveness of the Company's internal controls, and the integrity of the Company's financial reporting process.

* * *

20.  Discuss with management, the independent auditors and the internal auditors, if any, the Company's policies to govern the process by which management assesses and manages the Company's risks, including the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures.

21. Endeavor to determine that auditing procedures and controls are adequate to safeguard Company assets and assess compliance with Company policies and legal requirements.

22. Review and discuss with the independent auditor the Company's internal audit function, if any, including its performance, responsibilities, staffing and budget.

## SUBSTANTIVE ALLEGATIONS

*Background*

51.    Paysign is a financial technology company founded in 2001 that provides card payment solutions and payment processing services for corporate, consumer, and government sector applications. Originally "3PEA Technologies, Inc.," the Company changed its name to Paysign, Inc on April 23, 2019.

52.    The Company operates primarily in the plasma donation and pharmaceutical industries, and its operations include enrolling cardholders, loading debit cards with value, managing accounts, and processing transactions.

*Paysign Has a History of Inadequate Accounting Oversight*

53.    Until 2008, Paysign's financial statements were audited by De Joya & Company. De Joya, Paysign's CFO between 2007-2015, was the principal of De Joya & Company—De Joya thus served simultaneously as Paysign's CFO and auditor between 2007 and 2008. De Joya resigned as CFO from the Company in October 2015, after he was sanctioned by the SEC for willfully violating Section 17(a) of the Securities Act and Rule 2-02 of SEC Regulation S-X. The SEC prohibited De Joya from practicing as an accountant before the SEC for three years.

54.    Between 2008 and 2017, Sarna & Company ("Sarna"), a sole practitioner with two staff members, audited Paysign's financial statements. Sarna resigned as Paysign's independent registered public accounting firm in 2017 after the Public Accounting Oversight Board ("PCAOB") published a report denouncing Sarna for issuing an audit report "without satisfying its

fundamental obligation to obtain reasonable assurance about whether the financial statements were free of material misrepresentations."[2] The PCAOB specifically found that SARNA "fail[ed] to perform sufficient procedures to test revenue recognition," and attributed this failure to a lack of "due professional care." *Id.* at 4, 11.

55.     In 2017, Paysign employed Squar Milner LLP ("Squar") as its auditor to replace Sarna. In addition to its work with Paysign, Squar audited the financial statements of Pareteum Corporation, a company accused of accounting fraud in 2019.

56.     Squar purportedly audited Paysign's Annual Report on Form 10-K filed with the SEC on March 12, 2019 (the "2019 10-K"), which contained numerous materially false and misleading statements described below. Paysign has even acknowledged that the 2019 10-K contained materially false and misleading statements. In the 2019 10-K, Paysign falsely stated that "we protect our intellectual property rights through a combination of trademark, patent, copyright and trade secret laws." Paysign further claimed in that filing that the Company owned "Patents and trademarks" valued at $36,073. In a Form 8-K filed with the SEC on September 9, 2019, the Company recognized that "we erroneously disclosed in our Annual Report on Form 10-K for the fiscal year that ended December 31, 2018 that we have patents, ***which we do not***."[3]

57.     In July 2020, Paysign terminated its relationship with Squar and appointed BDO USA, LLP as the Company's new public accounting firm.

*De Joya Assists in the Preparation of the Company's Financial Statements Despite the SEC Cease-And-Desist Order Prohibiting De Joya From Practicing as an Accountant*

58.     De Joya served as the Company's CFO from 2007 to 2015 and was the principal partner of both De Joya & Co.—Paysign's auditor prior to 2008—and De Joya Griffith LLC ("DJGL").

59.     In January 2015, the SEC filed charges against DJGL and De Joya personally, in connection with a fraudulent microcap scheme perpetrated by a stock promotor named Jonathan Briner ("Briner"). On September 18, 2015, De Joya and DJGL consented to the entry of a Cease-

---

[2] See PCAOB Report on 2016 Inspection of Sarna & Company, Certified Public Accountants, available at https://pcaobus.org/Inspections/Reports/Documents/104-2017-080-Sarna.pdf, at 4.
[3] Unless indicated otherwise, all emphasis is added in this Complaint.

and-Desis Order (the "Cease and Desist Order") prohibiting De Joya from appearing or practicing before the SEC as an accountant for three years and prohibiting DJGL from appearing or practicing before the SEC as an accountant for five years. As a result of the SEC enforcement action, DJGL surrendered its accounting license in December 2015. The NSBA further imposed a thirty month probation on De Joya in connection with the microcap scheme.

60.     According to the Cease and Desist Order, Briner, an attorney who was prohibited from practicing before the SEC at that time as a result of his participation in a pump-and-dump and market manipulation scheme, engaged DJGL to conduct audits of financial statements for various Briner-related entities that were to be included in Form S-1 registration statements filed with the SEC.

61.     In a press release issued the same day as the Cease and Desist Order, the SEC stated that the audits "were allegedly so deficient that they effectively amounted to no audits at all and the auditors allegedly ignored red flags suggesting that Briner was engaging in fraud."

62.     The Cease and Desist Order identified several red flags that De Joya specifically ignored. For example, De Joya received DJGL staff emails notifying him of Briner's involvement in dozens of fraudulent schemes. Further, De Joya and his DJGL associates discussed Briner's past misconduct in face-to-face meetings, yet they continued to work with the Briner related entities. The Cease and Desist Order concluded that DJGL and its affiliates ignored red flags in accepting the issuers as clients, failed to respond to serious concerns that Briner was engaging in fraudulent activity, failed to properly audit the issuers' cash, and overlooked basic accounting errors and inconsistencies between the financial statements and registration statements.

63.     The Cease and Desist Order is publicly available and De Joya to this day is identified by OTC Markets Group, a financial market for nearly 10,000 over-the-counter securities, as one of only 96 prohibited accountants in the United States.

64.     Despite knowledge of the SEC disciplinary action and De Joya's status as a prohibited accountant for OTC Markets Group's 10,000 listed securities, the Individual Defendants employed De Joya to participate in Paysign's accounting function and contribute to the preparation of Paysign's financial statements between 2017 and 2019.

*Former Employees*

65.     FE 1 worked at Paysign as a Senior Accountant between November 2015 and July 2016. FE 1 shared an office with De Joya. FE 1 recalled that De Joya was regularly at the Company headquarters and confirmed that he worked on Paysign's financial statements and other public documents filed with the SEC.

66.     FE 2 worked at Paysign as a Corporate Trainer between October 2018 and September 2019. As a Corporate Trainer, FE 2 developed training materials for Paysign Customer Service Representatives. FE 2 additionally trained Defendant Newcomer on the use of the Company's central service desk where employees reported IT issues. FE 2 recalled De Joya working in the Accounting department at the Company's headquarters in an office adjacent to the Individual Defendants' offices.

67.     FE 2 further worked as a Customer Service Representative and recalled Defendant Spence regularly making programming changes to the Company's internal system that stored customer account information without notifying other employees. According to FE 2, the programming changes would alter the account balances on customers' prepaid cards. As a result, customers frequently called Paysign to complain, but FE 2 and other Customer Service Representatives were unable to provide a reason for the discrepancies. FE 2 recalled that this issue was widely known throughout the Company and that Defendant Herman informed Defendant Newcomer about the issue.

68.     FE 3 worked at Paysign as the Senior Director of Pharmaceutical Account Management between April 2018 and January 2019. In December 2018, FE 3 became aware that De Joya had worked directly with Defendant Newcomer to develop processes related to the use of MasterCard and Visa as payment vehicles within the Company's Reward and Plasma groups. According to FE 3, it was widely known within the Company that De Joya was "not legally able to" perform certain duties.

69.     FE 4 worked at Paysign as a Call Center Manager between April 2016 and January 2020. As the Call Center Manager, FE 4 reported directly to Defendant Herman. FE 4 stated that De Joya was regularly in the Company headquarters beginning in middle of 2018. FE 4 recalled

De Joya telling FE 4 that he had been working closely with Defendant Newcomer for years. According to FE 4, De Joya's office was adjacent to Defendant Attinger's office, and De Joya worked closely with Defendant Attinger. FE 4 further corroborated FE 2's account and confirmed that software updates caused changes in the balances of customers' prepaid cards.

70.     FE 5 worked at Paysign as a front-end developer in the IT department between May 2018 and October 2019. In Paysign's 2020 10-K, the Individual Defendants disclosed a material weakness in the Company's IT general controls related to access to "privileged user accounts and the Company's change management to material financial applications." FE 5 explained that "change management" refers to managing software updates, releasing new updates, or notifying users that a software update is available.

71.     Given that this "change management" deficiency was created by Defendant Spence and that Defendants Herman and Newcomer were aware of the issue during the Relevant Period, the Individual Defendants either knew or recklessly disregarded that the Company's information technology general controls were inadequate throughout the Relevant Period.

72.     FE 6 worked at Paysign as an Accounting Manager between November 2019 and December 2019 and worked directly under Defendant Attinger. FE 6 reviewed Paysign's accounts payable and corrected accounting errors in the Company's journal entries. According to FE 6, Paysign's Accounting department consisted of five people, including FE 6, a controller, and Defendant Attinger, and the Company had designated FE 6 as the "clean up person" for the "mess" in Paysign's accounting. FE 6 stated that the controller failed to establish an automated system to input information from Paysign's bank account into the Company's accounting software, and as a result, the Company's internal revenue reports contained material errors. FE 6 recalled discussing the issue with Defendant Attinger. According to FE 6, at the end of 2019, FE 6 worked directly with Defendant Attinger to rectify the issue, amending journal entries to correct the accounting errors.

***The Individual Defendants' Materially False and Misleading Statements***

73.     The Relevant Period begins on March 12, 2019, when the Company filed its Annual Report on Form 10-K (the "2019 10-K"), signed by Defendants Newcomer, Spence,

Herman, Henry, Mina, Triplett, and Williams. With respect to "key personnel" at the Company, the 2019 10-K stated:

> **We depend on key personnel and could be harmed by the loss of their services because of the limited number of qualified people in our industry.**
>
> Because of our small size, we require the continued service and performance of our management team, sales and technology employees, all of whom we consider to be key employees. Competition for highly qualified employees in the financial services and healthcare industry is intense. ***Our success will depend to a significant degree upon our ability to attract, train, and retain highly skilled directors, officers, management, business, financial, legal, marketing, sales, and technical personnel and upon the continued contributions of such people. In addition, we may not be able to retain our current key employees. The loss of the services of one or more of our key personnel and our failure to attract additional highly qualified personnel could impair our ability to expand our operations and provide service to our customers.***

74.    This statement was materially false and misleading when made and omitted to state material adverse facts necessary to make the statement not misleading because it failed to disclose that: (i) the Individual Defendants employed an accountant prohibited from practicing before the SEC to assist in the preparation of the Company's financial statements filed with the SEC in 2017, 2018 and 2019, and as a result (ii) the Company's "success" premised upon its ability to retain "highly skilled" personnel was already compromised at the time the statement was made.

75.    The 2019 10-K contained the following risk disclosure:

> **We Incur Significant Costs As A Result Of Operating As A Public Company. We May Not Have Sufficient Personnel For Our Financial Reporting Responsibilities, Which May Result In The Untimely Close Of Our Books And Record And Delays In The Preparation Of Financial Statements And Related Disclosures.**
>
> As a registered public company, we have experienced an increase in legal, accounting and other expenses. In addition, the Sarbanes- Oxley Act of 2002 (the "Sarbanes-Oxley Act"), as well as new rules subsequently implemented by the SEC, has imposed various requirements on public companies, including requiring changes in corporate governance practices. Our management and other personnel need to devote a substantial amount of time to these compliance initiatives. Moreover, these rules and regulations have increased our legal and financial compliance costs and make some activities more time-consuming and costly. ***If we are not able to comply with the requirements of Sarbanes-Oxley Act, or if we***

*or our independent registered public accounting firm identifies additional deficiencies in our internal control over financial reporting that are deemed to be material weaknesses, the market price of our stock could decline and we could be subject to sanctions or investigations by the SEC and other regulatory authorities.*

76.     This statement was materially false and misleading because the risk characterized as merely hypothetical had already materialized. Specifically, the Individual Defendants knew or recklessly disregarded that "deficiencies in [Paysign's] internal control over financial reporting," constituting "material weaknesses," already existed, including: (i) the employment of an accountant prohibited from practicing before the SEC to assist in the preparation of Paysign's financial statements; (ii) the inaccuracies in the Company's cash flow figures and inability of the Company to properly track revenues; and (iii) the programming changes implemented by Defendant Spence that altered the account balances on customers' prepaid cards.

77.     The 2019 10-K further contained the following generic risk disclosure:

Our business is dependent on the efficient and uninterrupted operation of computer network systems and data centers.

Our ability to provide reliable service to our clients and cardholders depends on the efficient and uninterrupted operation of our computer network systems and data centers as well as those of our third party service providers. Our business involves movement of large sums of money, processing of large numbers of transactions and management of the data necessary to do both. Our success depends upon the efficient and error-free handling of the money. *We rely on the ability of our employees, systems and processes and those of the banks that issue our cards, our third party service providers to process and facilitate these transactions in an efficient, uninterrupted and error-free manner.*

In the event of a breakdown, a catastrophic event (such as fire, natural disaster, power loss, telecommunications failure or physical break-in), a security breach or malicious attack, *an improper operation or any other event impacting our systems or processes, or those of our vendors, or an improper action by our employees, agents or third-party vendors, we could suffer financial loss, loss of customers, regulatory sanctions and damage to our reputation.* The measures we have taken, including the implementation of disaster recovery plans and redundant computer systems, may not be successful, and we may experience other problems unrelated to system failures. We may also experience software defects, development delays and installation difficulties, any of which could harm our business and reputation and expose us to potential liability and increased operating expenses. We currently do not carry business interruption insurance.

78.     This statement was materially false and misleading because the risk characterized as merely hypothetical had already materialized. An "improper operation . . . impacting [Paysign's] systems or processes" already existed and was causing harm to the Company. Specifically, the programming changes implemented by Defendant Spence caused a material weakness in the Company's IT general controls.

79.     With respect to the efficacy of the Company's internal controls over financial reporting as of December 31, 2018, the 2019 10-K stated:

> Our chief executive officer and chief financial officer evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934) as of December 31, 2018. ***Based on that evaluation, our chief executive officer and chief financial officer concluded that, as of the evaluation date, such controls and procedures were effective.***
>
> * * *
>
> As of December 31, 2018 we conducted an evaluation, under the supervision and with the participation of our chief executive officer (our principal executive officer), our chief operating officer and our chief financial officer (also our principal financial and accounting officer) of the effectiveness of our internal control over financial reporting based on criteria established in Internal Control - Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission, or the COSO Framework. Management's assessment included an evaluation of the design of our internal control over financial reporting and testing of the operational effectiveness of those controls.
>
> A material weakness is defined within the Public Company Accounting Oversight Board's Auditing Standard No. 5 as a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. ***Based upon this assessment, management concluded that our internal control over financial reporting was effective as of December 31, 2018.***

80.     This statement was materially false and misleading and omitted to state material adverse facts necessary to make the statement not misleading because it failed to disclose that: (i) the Individual Defendants knowingly or recklessly employed an accountant prohibited from practicing before the SEC to assist in the preparation of Paysign's financial statements filed with the SEC in 2017, 2018, and 2019; (ii) the Company's revenue and cashflow figures were

materially inaccurate; and (iii) the programming changes implemented by Defendant Spence altered the account balances for customers' prepaid debit cards.

81.    On May 8, 2019, Paysign filed a Quarterly Report on Form 10-Q with the SEC (the "1Q 2019 10-Q"). With respect to the efficacy of the Company's internal controls over financial reporting, the 1Q 2019 10-Q stated:

> Our chief executive officer and chief financial officer are responsible for establishing and maintaining our disclosure controls and procedures. Disclosure controls and procedures means controls and other procedures that are designed to ensure that information we are required to disclose in the reports that we file or submit under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms, and to ensure that information required to be disclosed by us in those reports is accumulated and communicated to the our management, including our principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure. Our chief executive officer and chief financial officer evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934) as of March 31, 2019. *Based on that evaluation, **our chief executive officer and chief financial officer have concluded that, as of the evaluation date, such controls and procedures were effective.***

82.    This statement was materially false and misleading and omitted to state material adverse facts necessary to make the statement not misleading because it failed to disclose that: (i) the Individual Defendants knowingly or recklessly employed an accountant prohibited from practicing before the SEC to assist in the preparation of Paysign's financial statements filed with the SEC in 2017, 2018, and 2019; (ii) the Company's revenue and cashflow figures were materially inaccurate; and (iii) the programming changes implemented by Defendant Spence altered the account balances for customers' prepaid debit cards.

83.    On August 7, 2019, the Company filed a Quarterly Report on Form 10-Q with the SEC (the "2Q 2019 10-Q"). With respect to the efficacy of the Company's internal controls over financial reporting, the 2Q 2019 10-Q stated:

> Our chief executive officer and chief financial officer are responsible for establishing and maintaining our disclosure controls and procedures. Disclosure controls and procedures means controls and other procedures that are designed to ensure that information we are required to disclose in the reports that we file or

submit under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms, and to ensure that information required to be disclosed by us in those reports is accumulated and communicated to the our management, including our principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure. Our chief executive officer and chief financial officer evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934) as of June 30, 2019. ***Based on that evaluation, our chief executive officer and chief financial officer have concluded that, as of the evaluation date, such controls and procedures were effective***.

84.     This statement was materially false and misleading and omitted to state material adverse facts necessary to make the statement not misleading because it failed to disclose that: (i) the Individual Defendants knowingly or recklessly employed an accountant prohibited from practicing before the SEC to assist in the preparation of Paysign's financial statements filed with the SEC in 2017, 2018, and 2019; (ii) the Company's revenue and cashflow figures were materially inaccurate; and (iii) the programming changes implemented by Defendant Spence altered the account balances for customers' prepaid debit cards.

85.     On November 6, 2019, the Company filed a Quarterly Report on Form 10-Q with the SEC (the "3Q 2019 10-Q"). With respect to the efficacy of the Company's internal controls over financial reporting, the 2Q 2019 10-Q stated:

Our chief executive officer and chief financial officer are responsible for establishing and maintaining our disclosure controls and procedures. Disclosure controls and procedures means controls and other procedures that are designed to ensure that information we are required to disclose in the reports that we file or submit under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms, and to ensure that information required to be disclosed by us in those reports is accumulated and communicated to the our management, including our principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure. Our chief executive officer and chief financial officer evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934) as of September 30, 2019. ***Based on that evaluation, our chief executive officer and chief financial officer have concluded that, as of the evaluation date, such controls and procedures were effective.***

- 25 -

86.     This statement was materially false and misleading and omitted to state material adverse facts necessary to make the statement not misleading because it failed to disclose that: (i) the Individual Defendants knowingly or recklessly employed an accountant prohibited from practicing before the SEC to assist in the preparation of Paysign's financial statements filed with the SEC in 2017, 2018, and 2019; (ii) the Company's revenue and cashflow figures were materially inaccurate; and (iii) the programming changes implemented by Defendant Spence altered the account balances for customers' prepaid debit cards.

***Insider Sales***

87.     During the Relevant Period, the Insider Trading Defendants collectively offloaded more than $5.7 million worth of Company stock at artificially inflated prices while in possession of material non-public information. The insider sales are detailed in the chart below:

| Insider | Sale Date | Shares | Price | Total |
|---------|-----------|--------|-------|-------|
| Newcomer | 4/18/2019 | 35,000 | $8.43 | $295,050 |
| Newcomer | 9/16/2019 | 200,000 | $11.03 | $2,206,000 |
| Henry | 9/18/2019 | 2,572 | $11.21 | $28,832 |
| Henry | 9/23/2019 | 14,308 | $11.01 | $157,531 |
| Spence | 9/23/2019 | 20,681 | $11.01 | $227,697 |
| Henry | 9/24/2019 | 1,100 | $11.03 | $12,133 |
| Spence | 9/24/2019 | 3,100 | $11.02 | $34,162 |
| Henry | 10/2/2019 | 1,800 | $11.00 | $19,800 |
| Spence | 10/2/2019 | 1,600 | $11.00 | $17,600 |
| Henry | 10/3/2019 | 31,674 | $11.02 | $349,047 |
| Spence | 10/3/2019 | 49,981 | $11.02 | $550,790 |
| Henry | 10/4/2019 | 98,546 | $11.53 | $1,136,235 |
| Spence | 10/4/2019 | 44,638 | $11.40 | $508,873 |
| Williams | 10/28/2019 | 15,000 | $10.94 | $164,100 |
| Total: | | 520,000 | | $5,707,850 |

88.     These four directors stood to lose millions of dollars had they waited to sell their shares of Paysign stock until after the truth was disclosed regarding the serious deficiencies with the Company's internal controls.

89.     Instead, The Insider Trading Defendants timely sold their shares to avoid declines in the stock price that would have resulted from disclosure.

///

90.     Importantly, none of the Insider Trading Defendants sold any stock in the previous two calendar years. Similarly, none of the Insider Trading Defendants sold any stock in 2020. Thus, the Insider Trading Defendants' abnormal trading pattern, occurring for just five months during 2019 and immediately before the Company's disclosure of severe internal control issues, indicates that the sales were a means of profiting from insider knowledge.

**The Truth Emerges**

91.     On March 16, 2020, the Company announced that it would be unable to timely file its Annual Report on Form 10-K. The Company disclosed that "in the course of completing its assessment of internal controls over financial reporting for 2019 and the company's initial year of compliance with [SOX] 404b, management identified material weaknesses related to (i) assessment of internal controls over financial reporting and (ii) information technology general controls."

92.     Just as the Insider Trading Defendants expected, the disclosure caused Paysign's stock price to decline significantly. On this news, the price of Paysign's common stock fell nearly 17% in one day to close at $4.59 on March 16, 2020. As the market continued to digest the news, the price of Paysign's common stock declined further, closing at $4.42 per share on March 17, 2020 and $4.06 per share on March 18, 2020.

93.     On March 31, 2020, Paysign issued a press release announcing that the Company's earnings call scheduled for that day would be delayed "to complete [Paysign's] year-end closing procedures."

94.     On this news, the price of Paysign's common stock declined by more than 22% in one day, closing at $4.35 per share on April 1, 2020. The price of Paysign's stock declined further on April 2, 2020, closing at $4.03 per share.

95.     On April 3, 2020, the Company filed an Annual Report on Form 10-K with the SEC (the "2020 10-K"). In a subsection titled "Auditor Opinion on Internal Control Over Financial Reporting" within the "Controls and Procedures" section, the 2020 10-K stated:

> Inadequate and ineffective management assessment of internal control over financial reporting, and ineffective design, implementation and monitoring of information technology general controls pertaining to privileged user accounts

and the Company's change management to financial applications. ***Additionally, the Company lacked sufficient monitoring and disclosure controls to prevent and terminate the employment of an individual barred from practicing before the Securities and Exchange Commission who assisted the Company in accounting matters related to the preparation of its financial statements for 2017, 2018 and 2019.***

96.    In a section titled "Management's Report on Internal Controls over Financial Reporting and Remediation Initiatives," the Individual Defendants disclosed that:

> [M]anagement concluded that our internal control over financial reporting was not effective. Material weaknesses included the management assessment of internal control over financial reporting, and ineffective oversight of information technology general controls pertaining to user access and the Company's systems change management. During quarter 4 of 2019 and continuing in 2020, management has taken steps to i) improve the design and methods for testing internal controls, ii) added resources to carry out such practices, and iii) instituted new procedures for managing system user access and change control. Additionally, a third material weakness cited by the auditors was that the Company lacked sufficient monitoring and disclosure controls when employing a part-time employee. The Company believes that it had sufficient monitoring and disclosure controls in place and received an opinion of counsel concluding that such work did not constitute a compliance failure. In any event, this situation has already been resolved by the individual no longer being employed by the Company.

97.    On April 6, 2020, during a conference call announcing the Company's financial results for the fourth quarter of 2019, Defendant Newcomer attributed the delay in filing the 2020 10-K to "several rounds of auditor request[s] for additional data, which took several days to complete." Defendant Attinger elaborated and explained that the Company and its auditors identified material weaknesses in its internal controls over financial reporting, including a lack of proper separation of responsibilities, inadequate documentation, and additional deficiencies related to "systems user access and change control."

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

98.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breach of fiduciary duties by the Individual Defendants.

99.    Paysign is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

100.    Plaintiff is a current shareholder of Paysign and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

101.    At the time this action was commenced, the seven-member Board was comprised of Defendants Newcomer, Henry, Mina, Herman, and Triplett, along with Matt Lanford and Jeffrey Newman, who are not parties to this action. Accordingly, Plaintiff is only required to show that four Directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, at least five of the Board's current members are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

102.    The Individual Defendants, together and individually, violated and breached their fiduciary duties of candor, good faith, and loyalty. Specifically, the Individual Defendants knowingly approved and/or permitted the wrongs alleged herein and participated in efforts to conceal those wrongs. The Individual Defendants authorized and/or permitted the issuance of various false and misleading statements, authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

103.    The Individual Defendants either knowingly or recklessly issued or caused the Company to issue the materially false and misleading statements alleged herein. The Individual Defendants knew of the falsity of the misleading statements at the time they were made. As a result of the foregoing, the Individual Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

104.    Moreover, the Individual Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and

1  procedures, and failed to make a good faith effort to correct the problems or prevent their
2  recurrence.

3    105.    Defendants Mina, Henry, and Triplett are not disinterested or independent, and
4  therefore, are incapable of considering a demand because they serve as members of the Audit
5  Committee during the Relevant Period and, pursuant to the Audit Committee Charter, were
6  specifically charged with the responsibility to assist the Board in fulfilling its oversight
7  responsibilities related to, inter alia, public disclosure requirements. Throughout the Relevant
8  Period, however, these Defendants breached their fiduciary duties to the Company by failing to
9  prevent, correct, or inform the Board of the issuance of material misstatements and omissions
10  regarding the ownership and control of the Company and its stock. Therefore, Defendants Mina,
11  Henry, and Triplett cannot independently consider any demand to sue themselves for breaching
12  their fiduciary duties to the Company, as that would expose them to substantial liability and
13  threaten their livelihood.

14    106.    The Individual Defendants, as members of the Board, were and are subject to the
15  Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties
16  required by applicable laws, rules, and regulations, requiring the Individual Defendants to also
17  adhere to Paysign's standards of business conduct. The Individual Defendants violated the Code of
18  Conduct because they knowingly or recklessly engaged in and participated in making and/or
19  causing the Company to make the materially false and misleading statements alleged herein.
20  Because the Individual Defendants violated the Code of Conduct, they face a substantial likelihood
21  of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

22    107.    Additionally, each of the Individual Defendants received payments, benefits, stock
23  options, and other emoluments by virtue of their membership on the Board and their control of the
24  Company.

25    108.    The Individual Defendants derive substantial revenue from the Company, control
26  the Company, and are indebted to each other. These conflicts of interest have precluded the
27  directors from adequately monitoring the Company's operations and internal controls and calling
28  ///

into question the other Individual Defendants' conduct. Thus, any demand on the current Board would be futile.

109. The Individual Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds i.e., monies belonging to the stockholders of Paysign. If there is a directors' and officers' liability insurance policy covering the Individual Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Individual Defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Individual Defendants were to sue themselves or certain officers of Paysign, there would be no directors' and officers' insurance protection. Accordingly, the Individual Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Individual Defendants is futile and, therefore, excused.

110. If there is no directors' and officers' liability insurance, then the directors will not cause Paysign to sue the Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

111. Thus, for all of the reasons set forth above, at least five of the directors are unable to consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## COUNT I

### Against the Individual Defendants for Violations of § 10(b)
### of the Exchange Act, 15 U.S.C. § 78(j), and Rule 10b-5, 17 C.F.R. § 240.10b-5

112. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

113. The Individual Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

///

114.    The Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the materially false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

115.    The Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated.

116.    The Individual Defendants acted with scienter because they: (i) knew that the public documents and statements issued or disseminated in the name of Paysign were materially false and misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

117.    The Individual Defendants, by virtue of their receipt of information reflecting the true facts of Paysign, their control over, and/or receipt and/or modification of Paysign's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Paysign, participated in the fraudulent scheme alleged herein.

118.    As a result of the foregoing, the market price of Paysign common stock was artificially inflated during the relevant time period. In ignorance of the falsity of the statements, stockholders relied on the statements described above and/or the integrity of the market price of Paysign common stock in purchasing Paysign common stock at prices that were artificially inflated as a result of these false and misleading statements and were damaged thereby.

119.    In addition, as a result of the wrongful conduct alleged herein, the Company has suffered significant damages, including reputational harm.

1

## COUNT II

2

### Against the Individual Defendants for Breach of Fiduciary Duty

3      120.    Plaintiff incorporates by reference and realleges the preceding allegations as if fully

4    set forth herein.

5      121.    The Individual Defendants owed the Company fiduciary obligations. By reason of

6    their fiduciary relationships, the Individual Defendants owed the Company the highest obligation

7    of good faith, fair dealing, loyalty, and due care.

8      122.    The Individual Defendants violated and breached their fiduciary duties of care,

9    loyalty, reasonable inquiry, and good faith.

10     123.    The Individual Defendants engaged in a sustained and systematic failure to properly

11   exercise their fiduciary duties. Among other things, the Individual Defendants breached their

12   fiduciary duties of loyalty and good faith by allowing or permitting false and misleading

13   statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise

14   failing to ensure that adequate internal controls were in place regarding the serious business

15   reporting issues and deficiencies described above. These actions could not have been a good faith

16   exercise of prudent business judgment to protect and promote the Company's corporate interests.

17     124.    As a direct and proximate result of the Individual Defendants' failure to fulfill their

18   fiduciary obligations, the Company has sustained significant damages.

19     125.    As a result of the misconduct alleged herein, the Individual Defendants are liable to

20   the Company. As a direct and proximate result of the Individual Defendants' breach of their

21   fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate

22   image and goodwill. Such damage includes, among other things, damage to the share price of the

23   Company's stock, resulting in an increased cost of capital, and significant reputational harm.

24

## COUNT III

25

### Breach of Fiduciary Duty
### Against the Insider Trading Defendants

26

27     126.    Plaintiff incorporates by reference and realleges each and every allegation set forth

28   above, as though fully set forth herein.

127.    During the Relevant Period, the Insider Trading Defendants held positions with the Company that provided them access to confidential, proprietary information concerning the Company's financial condition and future business prospects.  Notwithstanding their duty to refrain from trading in Paysign's common stock under the circumstances, the Insider Trading Defendants sold their holdings in the Company at artificially inflated prices prior to the disclosure of the true state of the Company's finances and future prospects.

128.    The insider sales detailed herein, were not part of any regular pattern of sales for the Insider Trading Defendants and were suspicious in terms of timing and amount.

129.    The information at issue was material non-public information concerning the Company's deficient internal controls. At the time of their stock sales, the Insider Trading Defendants were aware that the Company's business and prospects were declining, which when disclosed to the market would case the inflated price of the Company's common stock to significantly decrease. The Insider Trading Defendants' sales of stock while in possession and control of this material, adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

130.    Plaintiff, on behalf of Paysign, as no adequate remedy at law.

## COUNT IV

### Unjust Enrichment
### Against the Individual Defendants

131.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

132.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Paysign.

133.    The Individual Defendants were unjustly enriched by their receipt of compensation and with respect to insider sales of Company stock.

134.    Plaintiff, as a shareholder and a representative of Paysign, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other

compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

### COUNT V

### Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty

135.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

136.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breach of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

137.    Plaintiff on behalf of Paysign has no adequate remedy at law.

### COUNT VI

### Against the Individual Defendants for Gross Mismanagement

138.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

The Individual Defendants, either directly or through aiding and abetting, failed to reasonably exercise their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the expectations and operations of a publicly held corporation.

As a direct and proximate result of the Individual Defendants' gross mismanagement alleged herein, the Company has sustained and will continue to sustain substantial damages.

Plaintiff on behalf of the Company has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein,

1  together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do

2  not participate therein or benefit thereby;

3        B.     Directing all Individual Defendants to account for all damages caused by them and

4  all profits and special benefits and unjust enrichment they have obtained as a result of their

5  unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock

6  sale proceeds, and imposing a constructive trust thereon;

7        C.     Awarding punitive damages;

8        D.     Awarding costs and disbursements of this action, including reasonable attorneys'

9  fees, accountants' and experts' fees, costs, and expenses; and

10        E.     Granting such other and further relief as the Court deems just and proper.

11  <u>JURY DEMAND</u>

12  Plaintiff hereby demands a trial by jury.

13  Dated this 1st day of October, 2023.

14

15                                  */s/  G. Mark Albright, Esq.*
                                G. MARK ALBRIGHT, ESQ. (NVBN 001394)

16                                  DANIEL R. ORMSBY, ESQ.  (NVBN 14595)
                                **ALBRIGHT, STODDARD, WARNICK &**

17                                  **ALBRIGHT**
                                801 South Rancho Drive, Suite D-4

18                                  Las Vegas, Nevada  89106
                                Tel: (702) 384-7111

19                                  Fax: (702) 384-0605
                                gma@albrightstoddard.com

20                                  dormsby@albrightstoddard.com

21

22

23

24

25

26

27

28

Albright Stoddard Warnick & Albright

## VERIFICATION OF SIMONE BLANCHETTE

I, Simone Blanchette, am the plaintiff in this action. I have reviewed the allegations made in the Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. As to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

9/15/2023

Dated: September ___, 2023

DocuSigned by:

*Simone Blanchette*

54ED39CD0C93D4C1...

SIMONE BLANCHETTE